[730 NYS2d 61]

In the Matter of Cologne Life Reinsurance Company et al.,
Respondents, v Zurich Reinsurance (North America),
Inc., Appellant.

First Department, September 6, 2001

## APPEARANCES OF COUNSEL

*Clifford H. Schoenberg* of counsel, New York City (*Cadwalader, Wickersham & Taft,* attorneys), for Cologne Life Reinsurance Company and another, respondents.

*Steven R. Schindler* of counsel, New York City (*Schindler Cohen & Hochman, L. L. P.,* attorneys), for Lincoln National Life Insurance Company, respondent.

*E. Paul Kanefsky* of counsel, New York City (*Edwards & Angell, L. L. P.,* attorneys), for Phoenix Home Life Mutual Insurance Company, respondent.

*Thorn Rosenthal* of counsel, New York City (*John H. de Boisblanc* and *Joel Kurtzberg* on the brief; *Cahill Gordon & Reindel,* attorneys), for appellant.

## OPINION OF THE COURT

ELLERIN, J.

This case began as a question of whether the dispute between the parties to an agreement was arbitrable pursuant to that agreement. The IAS court granted petitioners' application for a permanent stay of arbitration and this appeal ensued. Although the arbitrability issue was mooted by respondent-appellant's withdrawal of its demand for arbitration, the question that remains at this stage is the underlying question of the enforceability of the agreement. We therefore convert this proceeding for a stay of arbitration into an action for a declaratory judgment and remand for further proceedings in accordance with this opinion. A review of the merits persuades us that there are issues of fact warranting a trial of the enforceability question.

### Facts

Cologne Life Reinsurance Company (Cologne), Connecticut General Life Insurance Company (Connecticut General), Lincoln National Life Insurance Company (Lincoln) and Phoenix Home Life Mutual Insurance Company (Phoenix), along with a fifth insurer that is not a party to this proceeding, ReliaStar Life Insurance Company (ReliaStar), were, for the year beginning March 1, 1998, members of a reinsurance pool (the Pool) managed and represented by nonparty Unicover Manag-

ers, Inc. (Unicover) pursuant to an Occupational Accident Reinsurance Pool Management Agreement (the Pool Management Agreement). The Pool offered reinsurance of workers' compensation risks. Under the Pool Management Agreement, Unicover had the authority to bind and execute reinsurance contracts and certain "retrocessional" contracts on behalf of the Pool. Each Pool member had the right to terminate its participation in the Pool, on at least 90 days' notice, as of the next anniversary date (March 1st) of the Pool Management Agreement.

During the summer of 1998, Zurich entered into a "fronting" arrangement with the Pool by which it "retroceded" to the Pool workers' compensation risks "ceded" to it by the Louisiana Workers' Compensation Corporation (LWCC). In September 1998, after the LWCC arrangement was in place, Unicover approached Zurich about the possibility of Zurich's similarly acting as a front for the Pool for the reinsurance of workers' compensation coverage provided by another insurer, nonparty Amerisafe Insurance Group (Amerisafe), for a two-year term to begin as of January 1, 1999. Negotiations ensued, and, in December 1998, Zurich signed the placement slip reflecting its agreement to reinsure Amerisafe, i.e., the "front-end" of the arrangement.

The placement slip reflecting the "back-end" of the arrangement, i.e., the agreement by which Zurich purported to retrocede the Amerisafe risk to the Pool (the Purported Retrocessional Agreement), was not signed by Unicover, purporting to act on behalf of the Pool, until March 1999. The record contains two placement slips, dated March 1, 1999 and March 4, 1999, which differ slightly in their terms, but both state that the final agreement will contain an arbitration clause. Subsequently, Unicover and Zurich executed a purported final contract memorializing the Purported Retrocessional Agreement, on which Unicover's signature is dated March 31, 1999. The purported final contract contains an arbitration clause.

As evidence of Unicover's authority to act on behalf of the Pool, Unicover, in connection with the negotiation of the LWCC and Amerisafe reinsurance, sent Zurich's agent, Guy Carpenter & Company (Carpenter), a copy of a "Letter of Authorization" from each Pool member, each dated during April 1998 (the Authority Letters). Four of the five Authority Letters state that Unicover had been granted authority for the period from March 1, 1998 to March 1, 1999. (For reasons unexplained in

the record or in the briefs, Connecticut General's Authority Letter states that authority had been granted for the period from March 1, 1998 to April 30, 1999.)

During the period from October 1998 through December 1998, each Pool member sent Unicover a letter terminating the member's participation in the Pool effective March 1, 1999 (the Termination Letters). In early 1999, questions began to be raised in the insurance industry and among insurance regulators as to the propriety of the reinsurance arrangements put in place on behalf of the Pool by Unicover. As a result, no Pool member ever revoked the Termination Letter it had sent to Unicover in 1998, and Unicover's actual authority to bind any Pool member terminated as of March 1, 1999, at the latest. In fact, petitioners Connecticut General and Cologne sent Unicover communications terminating its authority as to them before March 1, 1999, i.e., as of January 25, 1999, and February 9, 1999, respectively.

In February 1999, the Connecticut Insurance Department issued a bulletin to all domestic insurance companies, dated the 25th (the February 1999 Bulletin), directing, *inter alia*, that:

> "Connecticut domestic life, accident and health insurers [such as Connecticut General and Cologne] shall not assume any reinsurance, including retrocessional layers, of any business originally written as * * * direct workers compensation insurance by insurers properly licensed to write workers compensation insurance * * *. Connecticut domestic life, accident and health insurers shall not enter into any new or renewal contracts of such reinsurance and/or accept any new or renewal exposures under existing contracts of such reinsurance."

After the February 1999 Bulletin was issued, there was a flurry of comment on it, and on the problems arising from Unicover's conduct of the business of the Pool generally, in insurance analysts' reports, the business media, and the insurance trade press. The Connecticut Insurance Department issued a subsequent bulletin, dated March 17, 1999 (the March 1999 Bulletin), clarifying that the February 1999 Bulletin required Connecticut "[d]omestic life, accident and health insurers * * * [to] make a good faith effort to terminate existing contracts [contravening the February 1999 Bulletin], unless they are legally obligated to honor commitments under an agreement that incepted prior to February 25, 1999."

Pursuant to the Purported Retrocessional Agreement, Zurich paid a premium of more than $5.5 million to Unicover, as

administrator of the Pool, on or about May 28, 1999. Unicover still had administrative authority under the Pool Management Agreement at that time, although its binding authority had been terminated.

By letter dated August 18, 1999, Cologne, on behalf of all Pool members, advised Zurich:

> "The Pool Members are currently investigating whether a valid and enforceable agreement exists between the Pool and [Zurich] with respect to business assumed by Zurich Re from [LWCC] and *Amerisafe Insurance Group*. In that connection, we would appreciate receiving copies of your broker's files regarding the placement of these risks." (Emphasis added.)

Thereafter, on or about August 25, 1999, Zurich paid Unicover another premium pursuant to the Purported Retrocessional Agreement.

By letter dated September 30, 1999, the members of the Pool advised Zurich that Unicover's administrative authority under the Pool Management Agreement had been terminated, and directed Zurich to make future premium payments into an escrow account. The letter advised that the Pool members were still "investigating the existence or non-existence of your company's putative contracts with the Pool." By letter dated December 9, 1999, Jack Scott of Connecticut General, on behalf of the Pool as a whole, advised Carpenter, Zurich's agent, that, based on the Pool's investigation up to that time, the Pool had "good reason to believe that no valid and enforceable contracts exist[ed]" between Zurich and the Pool as to the Amerisafe risks. Subsequently, on December 13, 1999, the new administrator of the Pool tendered return of the premiums Zurich had paid pursuant to the Purported Retrocessional Agreement.

In March 2000, Zurich demanded arbitration of the parties' dispute as to the validity of the Purported Retrocessional Agreement pursuant to the arbitration clause thereof. Thereafter, the petition in this proceeding was filed, and the application was brought on by order to show cause. Petitioners sought a stay of arbitration on the ground that the Purported Retrocessional Agreement, which contained the arbitration clause, did not constitute a contract between the parties because Unicover had neither actual nor apparent authority to execute it on behalf of the Pool in March 1999, and because petitioners had not subsequently ratified it. Zurich opposed the application on

the grounds that Unicover had held actual or apparent authority to execute the Purported Retrocessional Agreement on behalf of the Pool, that petitioners had in any event subsequently ratified the Purported Retrocessional Agreement, and that any question as to the legality of the Purported Retrocessional Agreement was for the arbitrators.

After the court granted petitioners' application for a permanent stay of the arbitration on the grounds that no arbitration agreement existed between the parties, Zurich withdrew its demand for arbitration with prejudice and waived all rights it might have had to have the dispute resolved through arbitration.

## Discussion

Although Zurich's express post-judgment withdrawal of its demand for arbitration and waiver of all relevant arbitration rights unquestionably moot the precise issue that was presented to Supreme Court—whether the parties' dispute as to the Purported Retrocessional Agreement is arbitrable—the underlying question of the enforceability of the agreement continues to be a live issue between the parties, and was addressed by them in Supreme Court and here. We therefore convert this proceeding into a declaratory judgment action (*see*, CPLR 103 [c]; *Matter of Diamond Asphalt Corp. v Sander*, 92 NY2d 244, 253 [on appeal from disposition of CPLR article 78 proceeding, which sought injunctive relief that had been rendered moot, Court of Appeals converted proceeding into a declaratory judgment action and addressed merits of parties' arguments]), and turn to the merits.

Zurich argues that it has raised the following issues of fact as to whether the Purported Retrocessional Agreement is a valid contract between itself and the Pool: whether Unicover bound the Pool to the Purported Retrocessional Agreement in November or December of 1998, when Unicover still had actual authority to bind the Pool; whether Unicover had actual binding authority in March 1999, when it signed the Purported Retrocessional Agreement; whether Unicover had apparent binding authority in March 1999; and whether any subsequent conduct by the Pool members resulted in a ratification of the Purported Retrocessional Agreement, even if Unicover had no actual or apparent binding authority in March 1999. Another issue that should be addressed is: to the extent that the Purported Retrocessional Agreement would otherwise be binding on petitioners, whether its enforcement would be barred by

illegality, pursuant to the Connecticut Insurance Department's February 1999 Bulletin.

### Whether the Pool Was Bound to the Purported Retrocessional Agreement in 1998

Zurich's executive, Kirby V. Montgomery, who did not actually conduct the negotiations himself, states in his affidavit that "the transaction was finalized—and all material terms agreed to by all parties—in November 1998." However, it is clear from the record that Unicover and Zurich's agent, Carpenter, continued to negotiate and change the terms of the contemplated retrocessional agreement until March 1999. Moreover, the Purported Retrocessional Agreement, which, by its own express terms, was to have a term of two years from January 1, 1999, was subject to the Statute of Frauds, under the law of both New York (General Obligations Law § 5-701 [a] [1]) and Connecticut (Conn Gen Stat § 52-550 [a] [5]), and Zurich does not even attempt to identify any document, or combination of documents, created before March 1999, that would have satisfied the Statute of Frauds. Thus, there is no triable issue of fact as to whether Unicover bound the Pool in 1998.

### Actual Authority as of March 1, 1999

Contrary to Zurich's arguments that the Termination Letters the Pool members sent Unicover were "equivocal," the letters unambiguously terminated Unicover's authority as of the stated date. The fact that some of the letters held out the possibility that they would be revoked before going into effect is irrelevant. Petitioners Connecticut General and Cologne, collectively representing 52.5% of total participation in the Pool, subsequently sent Unicover letters during January and February 1999 that immediately terminated Unicover's authority as to them, and petitioners Cologne and Lincoln sent Unicover letters dated March 1, 1999, confirming that Unicover's authority as to them had been terminated. Consequently, Unicover could not reasonably have entertained the belief that it had authority to bind the Pool as of March 1, 1999, notwithstanding that it sent Zurich an April 14, 1999 letter, apparently not sent to any of the Pool members, asserting that the Purported Retrocessional Agreement was valid. There is no triable issue of fact as to whether Unicover had actual authority to bind the Pool as of March 1, 1999.

## Apparent Authority as of March 1, 1999

It appears from the record that the only representations by the Pool members concerning Unicover's authority that were known to Zurich as of March 1999 were the April 1998 Authority Letters, signed by the Pool members, which Unicover had transmitted to Zurich's agent. However, as to four of the five Authority Letters, which stated that Unicover had been granted authority for the period from March 1, 1998 "to March 1, 1999," Zurich was on notice that Unicover's authority would terminate on or about March 1, 1999. Even if the representation that Unicover had been granted authority "to March 1, 1999" could be construed to mean that Unicover continued to have authority on March 1, 1999, a reasonably prudent insurance company would not have relied on that construction of the language of the Authority Letters without seeking to confirm that Unicover actually had binding authority as of March 1, 1999.

Zurich notes that each Authority Letter states that Unicover's authority "will continue on an annual basis unless notice of non-renewal is given," and points out that the Pool members never gave Zurich or its agent any "notice of non-renewal" prior to the execution of the Purported Retrocessional Agreement. However, it is clear that the Authority Letters, which were not addressed to any specific third party, were referring to a "notice of non-renewal" given to Unicover, not to the various third parties to which Unicover would distribute the Authority Letters from time to time in the course of conducting business on behalf of the Pool.

Contrary to Zurich's suggestions, the April 14, 1999 letter it received from Unicover could not give rise to apparent authority, since apparent authority arises from "misleading conduct on the part of the principal—not the agent" (*Ford v Unity Hosp.*, 32 NY2d 464, 473).

The foregoing undisputed evidence establishes, as a matter of law, that Unicover did not have apparent authority to bind the Pool as of March 1, 1999, without regard to the February 1999 Bulletin. However, even if apparent authority otherwise would have existed as of March 1, 1999, the February 1999 Bulletin, which Zurich received as a Connecticut-incorporated insurance company, would have dissipated it. The bulletin cast into doubt the legality of the participation of the two Connecticut-based Pool members, Connecticut General and Cologne, collectively representing 52.5% of total participation in the Pool. It would therefore be unreasonable for Zurich to

continue to rely on the Authority Letters without confirmation from the Pool members that Unicover's authority still existed notwithstanding the issuance of the bulletin. Had Zurich diligently inquired into the matter after the issuance of the February 1999 Bulletin, it would have learned that Unicover's authority to bind each Pool member had been terminated as of March 1, 1999 or, in the cases of Connecticut General and Cologne, earlier.

## *Ratification*

Kirby V. Montgomery of Zurich states in his affidavit that Zurich was interested in the possibility of effecting an "early termination" of its retrocessional arrangements with the Pool as to both LWCC and Amerisafe. Accordingly, after securing Unicover's consent, he personally discussed this possibility in telephone conversations in mid-April 1999 with identified executives of each petitioner, as well as an executive of ReliaStar. Montgomery emphasizes that the conversations concerned the Amerisafe retrocession, not just the concededly valid LWCC retrocession. He states that none of the Pool member executives told him during these conversations that his member company was not bound by the Purported Retrocessional Agreement because it had terminated Unicover's binding authority prior to the execution of the Purported Retrocessional Agreement.

Section 94 of the Restatement (Second) of Agency provides: "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it" (*see also*, § 94, comment *c* ["If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time, is, unless explained, sufficient evidence of affirmance"] and illustration 5). Petitioners' executives may not have expressly acknowledged the validity of the Purported Retrocessional Agreement in their phone conversations with Montgomery, but, if the Amerisafe retrocession were one of the subjects discussed, their failure to repudiate the Purported Retrocessional Agreement would constitute evidence of affirmance of it and, from that affirmance, ratification could arise.

Although in their affidavits the Cologne and Connecticut General executives with whom Montgomery spoke asserted

that they discussed only the LWCC arrangement with him—the Lincoln executive does not specifically deny that Montgomery brought up the Amerisafe arrangement, and no affidavit was submitted from the relevant Phoenix executive—this simply raises an issue of fact as to the scope of the telephone conversations. While most of the written correspondence following up on the phone calls, including letters by Montgomery, refers only to the LWCC arrangement, one such letter, from ReliaStar, the non-party Pool member, refers to both the LWCC and Amerisafe programs. Thus, a triable issue of fact, reducing to a question of credibility, exists as to whether petitioners ratified the Purported Retrocessional Agreement in their April 1999 phone calls with Zurich.

Montgomery states in his affidavit that, pursuant to the Purported Retrocessional Agreement, Zurich paid Unicover, as agent for the Pool, a premium of approximately $5.5 million on or about May 28, 1999, several months before the Pool members first raised an issue as to the validity of the Purported Retrocessional Agreement by their August 18, 1999 letter to Zurich. Of course, a principal's acceptance of benefits from a contract that was unauthorized when originally executed constitutes an affirmance of the contract that, under appropriate circumstances, will give rise to a ratification (*see, e.g., Propoco, Inc. v Birnbaum*, 157 AD2d 774, 776; Restatement [Second] of Agency § 98 ["Receipt of Benefits as Affirmance"]). The affidavits submitted by petitioners, to the extent that they address this point at all, do not specifically deny that petitioners were aware of this premium payment when it was made, that Unicover remitted to each petitioner its proportionate share of that premium, or that each petitioner accepted the share of the premium tendered to it by Unicover. Rather, the two executives who addressed the premium issue in their affidavits, Joseph Brandon of Cologne and Jack Scott of Connecticut General, state only the following (in identical words):

> "[The Pool members] had no control over [Unicover's] receipt of premiums, and had no reason at the time to believe the premiums remitted by Zurich Re to [Unicover] were attributable to a program bound and executed by [Unicover] after its binding and execution authority had been revoked." (Emphasis in original.)

From the foregoing, it appears that petitioners were aware of the Purported Retrocessional Agreement and all of its material terms when the May 1999 premium was paid, but were not aware of the date on which Unicover had executed the

Purported Retrocessional Agreement. Petitioners rely on the well-established principle that "ratification of an agent's acts requires knowledge of material facts concerning the allegedly binding transaction" (*Matter of New York State Med. Transporters Assn. v Perales*, 77 NY2d 126, 131, citing, e.g., Restatement [Second] of Agency § 91). However, the only fact of which they claim to have been unaware at the time of the alleged ratification is that Unicover executed the Purported Retrocessional Agreement after its binding authority had been terminated. In other words, petitioners' somewhat circular argument is that they could not have ratified the contract because they were unaware that it had been unauthorized in the first place.

However, even if ignorance of the date of execution of the contract could be deemed "material" for these purposes (*see*, Restatement [Second] of Agency § 91 [2]), petitioners must have been aware of their own ignorance. They do not allege that Unicover ever misrepresented the date of the execution of the Purported Retrocessional Agreement to them.

Section 91 of the Restatement (Second) of Agency ("Knowledge of Principal at Time of Affirmance") provides in pertinent part:

> "(1) If, at the time of affirmance, the purported principal is ignorant of material facts involved in the original transaction, *and is unaware of his ignorance*, he can thereafter avoid the effect of the affirmance" (emphasis added; *see also*, § 91, comment *e* ["(I)f, learning that one who had no authority acted for him, (the principal) affirms without qualification and without investigation, when he has reason to believe that he does not know all the facts, it may be inferred that he is willing to assume the risks of facts of which he has no knowledge"]).

Thus, a triable issue of fact exists as to whether petitioners' affirmance of the Purported Retrocessional Agreement constituted a ratification even if, at the time of the affirmance, they were unaware that Unicover had executed the contract after its authority had been terminated.

Petitioners complain that a number of arguments made in Zurich's reply brief have been raised there for the first time on appeal, or for the first time in the entire proceeding. Since our disposition of this appeal, to the extent that it is favorable to Zurich, is based solely on the April 1999 telephone calls and

the May 1999 premium payment, which may give rise to a ratification, and petitioners do not seek to strike Zurich's ratification argument insofar as it is based on these matters, petitioners have not been prejudiced by the inclusion of such matters. Therefore, the motion to strike is denied.

Accordingly, the judgment of the Supreme Court, New York County (Walter Tolub, J.), entered September 27, 2000, which granted petitioners' application for a permanent stay of arbitration, should be modified, on the law, so as to convert the CPLR article 75 proceeding seeking a stay of arbitration into a declaratory judgment action, pursuant to CPLR 103 (c), and to remand it as such for further proceedings in accordance herewith, and otherwise affirmed, without costs. Petitioners' motion to strike portions of respondent's reply brief should be denied.

WILLIAMS, J. P., LERNER, SAXE and BUCKLEY, JJ., concur.

Judgment, Supreme Court, New York County, entered September 27, 2000, modified, on the law, so as to convert the CPLR article 75 proceeding seeking a stay of arbitration into a declaratory judgment action, pursuant to CPLR 103 (c), and to remand it as such for further proceedings in accordance with this Court's opinion, and otherwise affirmed, without costs. Petitioners' motion to strike portions of respondent's reply brief denied.