(June 19, 2008)

■ ALAN M. GOLDSTON, as Assignee of GOLDSTON & SCHWAB, LLP, Appellant, v BANDWIDTH TECHNOLOGY CORP. et al., Respondents. [859 NYS2d 651]—

---

Judgment, Supreme Court, New York County (Rolando T. Acosta, J.), entered on or about March 19, 2007, after a nonjury trial, in an action by an attorney against former clients for specific performance of a retainer agreement, insofar as appealed from, holding the subject retainer agreement to be void and unenforceable, unanimously reversed, on the law, without costs, and judgment awarded in favor of plaintiff for 2% of defendant Bandwidth Technology Corp.'s authorized and outstanding shares, and the matter remanded for further proceedings, including the entry of an amended judgment.

Under well-established rules applicable to the principal-agent relationship, defendant Bandwidth Holdings Corp. and its wholly owned subsidiary, Bandwidth Technology Corp. (BTC), are bound by the retainer agreement signed by their president, Jonathan Star. Star had at least apparent authority to enter into the agreement with Goldston & Schwab (G & S), plaintiff's predecessor in interest. The corporations actually received services from the law firm under the agreement, and BTC further ratified the agreement by adopting a resolution terminating plaintiff, then the remaining member of G & S, from his position as corporate counsel. Defendants have set forth no grounds upon which they may be relieved from performance under the retainer agreement, and they are required to compensate plaintiff according to its terms.

The essential facts are uncontroverted. G & S entered into a September 1998 agreement to provide legal services to defendants BTC and Bandwidth Holdings Corp. The retainer agreement was duly executed by Jonathan Star, as president of defendant corporations. The agreement sets the law firm's compensation for its services to defendants at four shares of BTC stock, representing a 2% interest in the corporation. The

agreement is for a fixed term of one year and retroactive to June 1, 1998, encompassing legal services rendered to the corporations prior to its execution, together with future services to be rendered throughout the balance of the contract term. In November 1998, Alan Schwab, plaintiff's law partner, left the firm and, by resolution adopted at a February 1999 shareholders' meeting, plaintiff was formally discharged by BTC from "any and all duties and authority granted to him as corporate attorney." Defendants failed to compensate plaintiff pursuant to the terms of the retainer agreement, and this action ensued.

After a nonjury trial, Supreme Court dismissed plaintiff's claim for compensation under the retainer agreement on the ground that defendants' president lacked the authority to engage the services of G & S without approval of the corporations' board of directors. The court concluded that the retainer agreement was void because Star did not have the authority to enter into a binding agreement on behalf of the corporations, adopting defendants' reasoning that the transfer of BTC stock to G & S as compensation for its services required board approval (citing Business Corporation Law §§ 504 and 505), which was not obtained.

Whether defendants are legally obligated to compensate plaintiff under the terms of the agreement is an issue that can be resolved as a matter of law. The agreement signed by Star, as agent for both corporations, is binding on defendants whether or not Star had actual authority to engage in the transaction or sought any necessary corporate approval. " 'The president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify . . . The true test of his authority to bind the corporation is . . . whether, at the time, he is engaged in the discharge of the general duties of his office, and in the business of the corporation' " (*Odell v 704 Broadway Condominium*, 284 AD2d 52, 56-57 [2001], quoting *Hastings v Brooklyn Life Ins. Co.*, 138 NY 473, 479 [1893]; *see Allied Sheet Metal Works v Kerby Saunders, Inc.*, 206 AD2d 166, 168 [1994] [vice-president has "at least apparent authority to bind the corporation"]).

The retention of corporate counsel by Star is clearly an act subsumed within "the powers which, of necessity, inhere in the position of chief executive" (*Odell*, 284 AD2d at 56) and one that was undertaken "in the discharge of the general duties of his office, and in the business of the corporation" (*id.* at 57 [internal quotation marks and citation omitted]; *see Park Riv. Owners Corp. v Bangser Klein Rocca & Blum*, 269 AD2d 313 [2000] [president had presumptive authority to institute action

and retain counsel]). Significantly, defendants do not contend that the retainer agreement is so extraordinary or provides for such unusual compensation as to require board approval (*see Ullman-Briggs, Inc. v Salton, Inc.*, 754 F Supp 1003, 1006 [SD NY 1991]; *Goldenberg v Bartell Broadcasting Corp.*, 47 Misc 2d 105, 109 [1965]). They argue only that the retainer agreement amounted to an "informally approved agreement" and that corporate practice "was to have all informally approved agreements signed by two principals."

Defendants' attempt to minimize the significance of a contract signed by their corporate president notwithstanding, an agreement entered into within the exercise of a corporate officer's apparent authority is binding on the corporation without regard to the officer's lack of actual authority (*Odell*, 284 AD2d at 57). Even in the instance where a chief executive's actual authority to enter into a particular agreement without the approval of the board of directors is in doubt, no obligation is imposed on the other party to the transaction "to show that [the president] did, in fact, consult the board" (*id.* at 56; *see Hallock v State of New York*, 64 NY2d 224, 231 [1984] [a principal is bound by a transaction entered into by its agent where the principal's conduct creates the appearance that the agent has such authority]). Even where an officer acts to the detriment of corporate interests, the law imposes no duty on a third party who deals with the corporation to inquire into its employee's actual authority. "The risk of loss from an unauthorized act of a dishonest employee falls on the corporation which appointed him to act on its behalf and not on the party who relies on his apparent authority" (*Geotel, Inc. v Wallace*, 162 AD2d 166, 168 [1990], *lv dismissed, lv denied* 76 NY2d 917 [1990]). Finally, it is well settled that the president of a corporation has presumptive authority to engage the services of counsel, even if those services exceed the terms of the general retainer agreement under which counsel was engaged (*Twyeffort v Unexcelled Mfg. Co.*, 263 NY 6, 9-10 [1933]).

Because the retention of counsel falls within the scope of the executive's apparent authority, his actual authority is immaterial, and internal procedures for review or ratification of corporate transactions are irrelevant (*cf. Leslie, Semple & Garrison v Gavit & Co.*, 81 AD2d 950, 951 [1981] [sale of corporation's physical assets]). Moreover, on the record before us, it is clear that defendants accepted the benefits of legal work performed by G & S and are therefore bound by the agreement, whether they authorized it or not (*see Matter of Cologne Life Reins. Co. v Zurich Reins. [N. Am.]*, 286 AD2d 118, 126 [2001],

citing Restatement [Second] of Agency § 94; *Eden Temporary Servs. v House of Excellence*, 270 AD2d 66, 67 [2000]). Thus, Supreme Court's finding that "it was company practice to have two principals sign all approved corporate contracts" is of no moment.

Business Corporation Law §§ 504 and 505 do not stand as an impediment to defendants' performance of their agreement with plaintiff. The former statute provides that "the judgment of the board or shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive" (Business Corporation Law § 504 [a]) and that shares may be issued for consideration for not less than the "value thereof, as is fixed from time to time by the board" (Business Corporation Law § 504 [c]). These provisions concern the valuation of stocks at time of issue (*see Vohra v Prasad Realty Corp.*, 174 AD2d 735, 735 [1991]), and do not preclude an agreement to award issued and outstanding shares in lieu of a cash payment (*id.* at 736; *see Torres v Speiser*, 268 AD2d 253 [2000]; *cf. Palmerton v Envirogas, Inc.*, 80 AD2 996 [1981] [purported agreement to purchase stock in newly-formed corporation]). Furthermore, testimony established that BTC was in turmoil at the time of the retainer because its right to use bandwidth technology, the corporation's only valuable asset, was being questioned by its inventor, John Leroy Silvers. Star testified that, at the time, the outlook for the company was bleak since Silvers, who was supposed to develop the technology for the corporation, was not cooperating. Star could not assess the value of the stock, except to say that "it wasn't worth a lot." Thus, Star's offer of the stock in compensation for legal services, and plaintiff's acceptance of it, were not based on any valuation of the corporation's shares, but rather were made with the understanding that such valuation was uncertain. Therefore, the transaction did not implicate Business Corporation Law § 504. Finally, Business Corporation Law § 505 governs only the issuance of "rights or options," neither of which are involved in the subject transaction.

Defendants assert that plaintiff performed little or no work for them following the signing of the retainer agreement, noting that at his deposition plaintiff "was unable to recall any work he performed for Bandwidth after November 1998." They conclude that plaintiff must look to Webface, Inc., defendant's predecessor, for reimbursement, and they seek to avoid any obligation under the retainer agreement on the ground that plaintiff did not render substantial performance.

Defendants' contention that G & S performed no work under the September 1998 retainer agreement for which compensa-

tion may be due disregards its plain language: "Goldston & Schwab LLP (the 'Firm') is pleased to have been engaged by Bandwidth Technology Corp. ('BTC'), formerly known as Webface, Inc., and by BTC's parent company Bandwidth Holdings Corp. (collectively, 'Company') to act as counsel for those entities. Pursuant to your request, and on the basis of the understanding set forth herein, we have been acting in that capacity since June 1, 1998, and we are pleased to continue to work for your organization." Defendants do not deny that, during the summer of 1998, G & S incorporated BTC and Bandwidth Holdings Corp., absorbing Webface into the corporate structure in what plaintiff described as a "reverse triangular merger." This plan was duly adopted by Webface and BTC on July 20, 1998. Defendants do not contend that this work represents less than substantial performance under the retainer agreement, only that plaintiff rendered no substantial services to them following its execution in September 1998. Since the parties' agreement expressly provides that the stated 2% interest in the corporation represents the firm's compensation "for the initial period June 1, 1998 through May 31, 1999," and it is clear that G & S performed substantial work for the corporation prior to the signing of the September 1998 agreement, the contention that plaintiff did not substantially perform under the retainer agreement is without merit.

Defendants further maintain that the dissolution of G & S by operation of law upon the departure of Alan Schwab, Esq. at the end of November 1998 constitutes a breach of the retainer agreement. Defendants intimate that they objected to the substitution of plaintiff for the law firm of Goldston & Schwab, asserting that they did not "waive the right to object to the substitution of Goldston for G & S following its dissolution."

This contention is belied by the record. The minutes of a shareholders' meeting dated February 19, 1999 include a resolution that "Alan Goldston be relieved of any and all duties and authority granted to him as corporate attorney and that he no longer be engaged as corporate attorney for Bandwidth Technology Corp." Apart from indications that plaintiff personally performed much of the legal work on behalf of G & S, this corporate resolution clearly establishes that plaintiff was officially recognized as "corporate attorney" and was regarded as defendants' general counsel, as the successor to G & S. In addition, the record is devoid of evidence that defendants were represented by any other attorney from the effective date of the retainer agreement to the date on which plaintiff was relieved as corporate counsel.

Further, there is no merit to defendants' contention that the departure of Schwab from G & S, resulting in its dissolution as a matter of law, constituted a breach of the retainer agreement. As this Court has noted, a change in the organization of a business does not, without more, give rise to a claim by a party contracting with that business even if the reorganization adversely affects the party's interests (*see Joan Hansen & Co. v Everlast World's Boxing Headquarters Corp.*, 296 AD2d 103, 107 [2002]; *Megaris Furs v Gimbel Bros.*, 172 AD2d 209, 214 [1991]).

The question of whether the retainer agreement constitutes a general retainer (*see Atkins & O'Brien v ISS Intl. Serv. Sys.*, 252 AD2d 446, 448 [1998]) or a nonrefundable special retainer compensable only in quantum meruit (*see Matter of Cooperman*, 83 NY2d 465, 475 [1994]) is answered by the terms of the agreement under which G & S was originally retained, which clearly provides for the engagement of "corporate counsel." In any event, contrary to defendants' insinuation, it is not dispositive that the subject retainer agreement contemplates the performance of such specialized work as litigation and filings with the Securities and Exchange Commission by other attorneys. It has long been recognized that the exclusion of certain legal work from the representation provided by counsel does not render a corporate retainer agreement anything other than a general retainer (*see Twyeffort*, 263 NY at 8).

It is apparent that defendants are simply disinclined to honor the terms of their contractual arrangement with plaintiff. This is curious in view of a March 1999 remuneration agreement with their investment advisor providing that the advisor is to receive 5% of the corporations' shares in exchange for its services. Defendants do not contend that either arrangement represents excessive compensation for the services received. In any event, parties to a contract may make a bargain as they see fit "even if the consideration exchanged is grossly unequal or of dubious value" (*Apfel v Prudential-Bache Sec.*, 81 NY2d 470, 475 [1993]), the operative factor being whether the promised consideration "is acceptable to the promisee" (*Weiner v McGraw-Hill, Inc.*, 57 NY2d 458, 464 [1982]).

"Absent a claim of fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny" (*Spaulding v Benenati*, 57 NY2d 418, 423 [1982]). However, even if this question were to be addressed, the value of plaintiff's services represented by the value of BTC stock at the time services were rendered was reasonable, as indicated by the value placed on the corporate shares in a March 17, 1999 purchase

agreement for a single share of stock for the price of $10,000. When plaintiff was discharged as corporate counsel in February 1999, BTC was still a company in the early stages of development, and the four shares promised to him had a recognized value of just $40,000. This sum is entirely consonant with the trial court's finding that the value of plaintiff's services in quantum meruit was $50,000.

In conclusion, defendants have presented no basis for relieving them of their obligation to compensate G & S in accordance with the terms of the retainer agreement, and no such basis is discernible on the record. Nor does any question of fact remain unresolved by the evidence amassed at trial. Concur—Tom, J.P., Buckley, Sweeny and Moskowitz, JJ.